## ILLINOIS STARCH COMPANY

### V.

## OTTAWA HYDRAULIC COMPANY.

*Mortgages—Strict Foreclosure—When Allowable—Strict Foreclosure under Mortgage Clause in Lease of Water Power.*

1.   The general rule is that a strict foreclosure of a mortgage will not be permitted where there are other incumbrances, or creditors, or purchasers of the equity of redemption. But where it appears that the property is of less value than the debt secured by the mortgage, and the mortgagor is insolvent and the mortgagee is willing to take the property in discharge of his debt, a strict foreclosure may be allowed.

2.   Upon a bill filed to foreclose, for rents due and unpaid, under the mortgage clause contained in a lease of a water power and a tract of land in connection therewith, it is *held:* That the lease in question was subject to the conditions of a lease held by the lessor from the Canal Trustees; that the evidence shows the premises to be worth less than the rent due; and that the court properly allowed a strict foreclosure, although it appeared that there was a judgment creditor of the lessee, who was also a purchaser at Sheriff's sale of its equity of redemption in the premises.

Illinois Starch Co. v. Ottawa Hydraulic Co.

[Opinion filed June 13, 1887.]

IN ERROR to the Circuit Court of La Salle County; the Hon. CHARLES BLANCHARD, Judge, presiding.

Messrs. BULL, STRAWN & RUGER, for plaintiff in error.

The court below clearly erred in decreeing a strict foreclosure of the mortgage clause of this lease, and that, too, even though you grant that the finding of the court, as to the value of the property, is supported by the weight of evidence. The courts in this State will never decree a strict foreclosure where it appears that there are subsequent purchasers, incumbrances, or creditors whose rights may be affected thereby; nor will a strict foreclosure be decreed even in cases where there are no subsequent incumbrances, unless it appears that the principal debtor is insolvent. Farrell v. Parlier, 50 Ill. 274; Boyer v. Boyer, 39 Ill. 447; Rourke v. Coulton, 4 Ill. App. 257; Miller v. Davis, 5 Ill. App. 474; Murphy v. Stith, 5 Ill. App. 562; Greenmeyer v. Deppe, 6 Ill. App. 490; Hollis v. Smith, 9 Ill. App. 109.

In order to maintain a strict foreclosure it must appear that the principal debtor was insolvent; that there are no subsequent incumbrances, or creditors who may be injured thereby; and that the equity of redemption remains in the principal debtor. In this case, the only evidence relied upon to show insolvency shows the existence of a judgment for a large amount in favor of Judge Caton, and establishes the further fact that the equity of redemption had been sold for $40,000, to one Thomas D. Catlin, prior to the time of the rendition of the decree, and unless there is an entire reversal of the long established rule in this State there can be, in this case, no strict foreclosure.

Messrs. LORENZO LELAND and H. T. GILBERT, for defendant in error.

Mr. JOHN DEAN CATON, a judgment creditor of the plaintiff in error, also filed a brief in support of its position.

BAKER, P. J.    The Illinois Starch Company was originally organized under the name of the Ottawa Starch Company, but afterward its name was changed to that which it now bears.

The present bill was filed by the Ottawa Hydraulic Company against the Starch Company for the purpose of foreclosing for rents due and unpaid under the mortgage clause contained in a lease executed by it to the Starch Company, the latter being designated therein by its original name of the Ottawa Starch Company.    The lease bore date on the first day of March, 1856, and the demised premises were a certain water power therein particularly described and a tract of land on the west side of La Salle Street in Ottawa; also described the water leased to be drawn from the hydraulic basin and used on said land.    By the terms of the lease it was to continue and be in force for the period of 999 years, with the privilege of renewing the same; and the lease covenanted to pay, as rent, the sum of $2,500 per annum, to be paid quarterly, in advance.    The lease, among other provisions, contained the following :

" It is further understood and agreed that in case of a failure on the part of the party of the second part, or its assigns, to pay the said rent at the time when it shall become due, time being hereby made an essential part of this contract, or in case of failure to comply with all the covenants and conditions herein, and also with all the covenants, conditions, limitations and restrictions contained in said lease from said Canal Trustees to said party of the first part, for the purpose of securing to the said parties of the first part the prompt payment of the said rent, and the performance of the said covenants to be kept and performed by the said party of the second part, the said party of the first part shall have the right to declare this lease absolutely null and void and so to consider, or the said party of the first part may, at its election, enforce the payment of said rent, and also for all damages for non-payment, and may also enforce compliance with the said lease from the said Canal Trustees and with all of the covenants in this lease, and may also, whether this lease shall be declared void or not, recover all damages for a breach of either of said leases by said party of the second part, or its assigns.

It is further understood and agreed that the rent therein covenanted to be paid by the said party of the second part, and also all of the covenants on the part of the said party of the second part herein contained, are to be a lien upon the said tract of land hereby leased, and all improvements thereon or which may be put upon the same, which shall include machinery of every kind used upon the said premises."

The right of the Ottawa Hydraulic Company to the water, water power and land leased to the Starch Company was obtained under a lease dated the 24th day of May, 1852, from the Board of Trustees of the Illinois and Michigan Canal to them. By the provisions of this latter lease this right expired at the end of twenty years from the date of such lease, with a right to renew the lease in periods of twenty years each, on the same terms or at such higher rent as might be offered by the highest responsible bidder.

In pursuance of the stipulations of the lease it was afterward renewed for a further term of twenty years, to expire in May, 1892.

Upon the hearing, the Circuit Court found the allegations of the bill of the Hydraulic Company to be true, that there was due for rent and for interest on installments of rent, after due, the sum of $8,964.41; that it was entitled to a first lien on the premises and machinery; that the Illinois Starch Company was insolvent and an execution would be unavailing; that it owned no property aside from its interest in the machinery and premises in question; that they were not worth over $6,000 and were insufficient to satisfy the amount due the Hydraulic Company, and that a sale would subject the latter to unnecessary charges and expenses. A decree was thereupon rendered for $8,964.41 and for a strict foreclosure, and it was ordered that in default of payment of the decree within 100 days from the entry thereof, the Hydraulic Company should be let into possession of the premises and improvements thereon.

Upon this writ of error, three objections are urged against the decree. It is insisted that the lease to the Starch Company purported to convey an absolute, unqualified and indefeasible leasehold estate for the period of 999 years, whereas the

Hydraulic Company had no absolute right for any such period, but its right and interest was subject to termination by the Canal Trustees if they could get better rent for the water at the end of any period of twenty years; and that as the Starch Com, any on the strength of its lease expended large sums of money in building and making improvements, it was error to render a decree for the rent claimed by the Hydraulic Company, without taking into consideration the fact that the Starch Company had been greatly damaged in the value of its expenditures by reason of the uncertain tenure of its water lease. There is no force in this point. The lease to the Starch Company expressly states that it is understood and agreed between the parties that all the conditions, limitations and restrictions contained in the lease of the Trustees of the Illinois and Michigan Canal to the Hydraulic Company, bearing date the 24th day of May, 1852, are to apply to and constitute part of this lease, and that the Starch Company, its lessees and assignees, are to be governed, limited and restricted by them, the water and land hereby leased being part of the water and land leased by the Trustees to the Hydraulic Company in and by this lease. This provision in the contract shows that the two leases are to be taken and construed together, and that it was the understanding and agreement between the parties that the second leasehold interest was not for 999 years absolutely, but for that term in the event the first leasehold interest was not terminated prior to the expiration of that period. Besides this, George H. Norris, who was president of the Starch Company and executed the second lease on its behalf, was at the same time a stockholder and director of the Hydraulic Company, and as such had signed the agreement of May 24, 1852, between the Canal Trustees and the latter company. In fact, we find no evidence whatever in the record even tending to prove the fraud that is alleged and stated in the answer of plaintiff in error.

In the second place, it is claimed that the evidence does not show the value of the property was less than the rent due. Four witnesses were examined at the hearing on behalf of the Hydraulic Company, all of whom stated they were well acquainted with the property. Lorenzo Leland testified that all

of the buildings and machinery together, were worth less than one-half of the debt. H. J. Logan testified that he was a millwright and acquainted with buildings and machinery for manufacturing purposes, and had experience in judging of their value; that he had recently examined the buildings and machinery in question, and the whole were worth in all not to exceed $5,000. H. A. Cushing testified that the whole thing would not be worth over $5,000 for any purpose. William Thomas testified that the expense of remodeling the building so as to adapt it for any practical purpose, would be greater than to build a new building for the same purpose, and that the expense of tearing it down would be greater than the value of the materials after it was torn down. Three witnesses were examined for the Starch Company. Charles A. Caton testified that the building and machinery had last been used, for a few months in the winter of 1881–82; and that since that time the Sanders Brothers had been employed at an expense of $2,500 to make repairs. He also made statements showing that prior to the time mentioned, large sums of money had been expended upon the premises. He further said that he would not undertake to state what the building was now worth or make any estimate of its present value.

William and Frank Sanders each declined to say what the building was now worth, but stated that it probably cost $50,-000 or $60,000 and had depreciated at least seventy-five per cent.

Without going further into the details of the testimony, we may observe that it conclusively shows that both the building and the machinery originally cost a great deal of money, and that years ago considerable sums were expended in making repairs, and that now they are both in a very dilapidated condition.

The statements of the witness Sanders, that the building had depreciated in value *at least* seventy-five per cent. are not equivalent to statements that in their judgments the building was now worth the twenty-five per cent. of original cost, as seems to be supposed by counsel; in fact they refused to place a value upon it.

In our opinion the evidence would not have justified the court in assuming a higher valuation for the property than it did.

The third and principal ground relied upon for a reversal of the decree, is the claim that it was error to award a strict foreclosure of the mortgage clause of the lease, because it appeared from the evidence there was a judgment creditor of the Illinois Starch Company who was also a purchaser at Sheriff's sale of its equity of redemption in the premises. We do not understand the rule in this State to be that a strict foreclosure will in no case, and under no circumstances, be allowed where there are other creditors, or other incumbrances upon the mortgaged property, or purchasers of the equity of redemption. It is undoubtedly true that the general rule is that a strict foreclosure will not be permitted where there is such creditor, purchaser or incumbrance; but, in our view, there are exceptions to this general rule. The authorities relied on by plaintiff in error are Farrell v. Parlier, 50 Ill. 274, and Boyer v. Boyer, 89 Ill. 447. In the first-mentioned case the Supreme Court said: "In our State, and in view of our statute, it is only in strong cases which form exceptions, that there should be decreed strict foreclosure. It may be in rare cases where it appears the property is of less value than the debt for which it was mortgaged, and the mortgagor is insolvent and the mortgagee is willing to take the property in discharge of his debt, that a strict foreclosure may be allowed. But it is not, as a general rule, proper, when there are other incumbrances upon the property, or creditors, or purchasers of the equity of redemption. "The statute allowing redemption in such cases intends to make the property pay as much of the mortgagor's debt as it is worth." Why was it said by the court that in any of the cases enumerated a strict foreclosure "is not, as a general rule, proper"? Why did they not say that in such cases such foreclosure "is not proper"? Why did they not omit the words, "as a general rule"?

We think the answer is obvious, and that it is plain they used those words as a qualifying clause, for the purpose of

qualifying the inflexible rule that would have been announced by the language of the court with the words in question omitted. A statement, a thing is *"thus,* as a general rule," *ex vi termini* imports there are exceptions to the rule enunciated. *Boyer* v. *Boyer* merely reiterates the doctrine announced and language employed in *Farwell* v. *Parlier*, and otherwise there is nothing in the case that throws light upon the present inquiry.

Assuming, then, that there are or may be exceptional cases that do not fall within the rule which prohibits a strict foreclosure where there are other incumbrances, or creditors, or purchasers of the equity of redemption, the question arises whether the suit at bar is such exceptional case. The evidence shows that John D. Caton recovered a judgment for $281,155.83 against the Illinois Starch Company, and that since this suit was begun the property in controversy was sold on an execution issued on said judgment for $40,000 to Thomas D. Catlin, the business agent, at Ottawa, of Judge Caton. The evidence also shows that the plaintiff in error is wholly insolvent, and has no property of any kind besides that, in respect to which its equity of redemption was foreclosed by the decree herein. It is important to bear in mind that by the terms of its contract the Ottawa Hydraulic Company not only had a first lien upon the property; but a right to declare a forfeiture on the first day of January, 1883, and every three months thereafter, and had it chosen to execute such right it might, time and again, have entirely extinguished all claims of the Illinois Starch Company and its creditors in or to such property. Instead of enforcing the harsh and effectual remedy it held within its own grasp and cutting off speedily and forthwith all right and interest of both plaintiff in error and its creditors, it sought relief in the court of equity, thereby expressing a willingness to waive the numerous acts of forfeiture, to give its debtor a day in court, and further and full opportunity to settle the just debt due it, and even the extension of the time of payment for a period of 100 days beyond the day of the entry of a decree of foreclosure. The evidence in this case shows that the property affords but scant payment to

defendant in error for its debt, and that it is not reasonably possible that either the plaintiff in error or the other creditors could reap any benefit even if the premises were sold with right of redemption. Most of the machinery has been removed, and that which is left is worth just about what old iron would sell for. The building is old, rotten and out of repair; the doors and windows are many of them gone, and the roof has in part fallen in. The witnesses state these facts and others of like effect, in regard to the present condition of the property, and they are not contradicted. They also state that tramps and stragglers can enter and go all through it, and sleep there without molestation, and that it is in constant danger of being burned.

It would be indeed fortunate if not only defendant in error but all the other creditors of the insolvent corporation could make their debts out of this property, but that can not be done. It is the intent of the law that the property of a mortgagor should pay as much of his indebtedness as it is worth; but the law does not presume it will pay more than it is worth. It would seem no good or beneficial result would be accomplished by keeping the Hydraulic Company out of possession fifteen months longer. The property is not worth its debt now, and is constantly deteriorating in value.

. This is not the case of an ordinary foreclosure of mortgage, where the amount due upon the preferred lien would increase only at the rate of six per cent. per annum; but here the preferred lien, at the end of fifteen months, will have increased not only to the extent of six per cent. upon $8,964.41, the amount of the decree, but in the further sum of $3,125 for rents accrued in the interim, unless the inequitable doctrine should be held that defendant in error should lose all benefit of its water power and land during such interim.

The premises have been used for no beneficial purpose since the winter of 1881–82, and if sale had been decreed, with right of redemption, they would have lain idle for fifteen months longer. In our opinion the whole question lies in a nutshell. The court of equity will not, by a decree of strict foreclosure, sacrifice the just and equitable rights of

creditors or of those holding second liens, or the equity of redemption.   Neither will the court of conscience sacrifice or endanger the rights of a complainant who comes within her portals with a just cause, and holding the oldest and preferred lien and best equity, for the bare possibility of a wholly improbable benefit to one having a second lien and subordinate equity.   In this case, if sale and redemption were allowed by the decree, and no redemption made, all the loss occasioned by the further decay and destruction of the property would fall upon defendant in error.   It would also lose all interest upon its decree, and $3,125 in water rents, and would at the time be compelled to pay rents upon the water power and property to the Canal Trustees.

The building is exposed to great danger of destruction by fire, and in the event it were burned down during the fifteen months allowed for redemption, the loss would fall wholly upon the Hydraulic Company; and in that case, in addition to losing the water rents accruing after decree entered, it would lose the moneys adjudged to it by the decree.   The rule that is intended to conserve the equities of the creditor, should not be used as a weapon to endanger or destroy the rights of the holder of the superior equity.

We think the present case, owing to the altogether peculiar circumstances out of which it arises, and of the property, is one of the exceptional cases which the opinion in *Farwell* v. *Parlier* intimates does not fall within the rule there announced.

The decree of strict foreclosure is affirmed.

*Decree affirmed.*